HUFFY CORPORATION, Respondent,

v.

CUSTOM WAREHOUSE, INC., Appellant.

No. ED 84843.

Missouri Court of Appeals, Eastern District, Division Two.

Aug. 2, 2005.

James W. Erwin, St. Louis, MO, for Appellant.

Matthew M. Mocherman, Cape Girardeau, MO, for Respondent.

ROBERT G. DOWD, JR., Judge.

This is an action for property damage by Huffy Corporation (Huffy) against Custom Warehouse, Inc. (CWI). CWI appeals from the judgment entered in favor of Huffy and against CWI for $254,677.62, which included $143,916.21 for damages to 2,155 bicycles. CWI argues the trial court erred in awarding Huffy $143,916.21 in property damage to bicycles because the only evidence of such damage was Exhibit 1, an inadmissible summary based on documentation Huffy was unable to produce for CWI's inspection. We affirm.

CWI admitted liability and the only issue at trial was Huffy's damages. Viewed in the light most favorable to the judgment, the following evidence was adduced at trial. Huffy was in the business of manufacturing, distributing and selling bicycles. In 1998, Phil Johnson (Johnson) was the materials manager of Huffy's Farmington, Missouri facility. Johnson's duties included keeping track of the condition and location of all of the bicycles and parts Huffy had either in production, storage or transit to distributors at any given time, including warehouse management.

On August 27, 1998, a CWI forklift operator struck a water main, flooding the warehouse facility and affecting approximately 8,000 to 10,000 of Huffy's packaged bicycles. On August 28, 1998, Johnson appeared at the Cape Girardeau CWI warehouse and personally inspected the damage. Johnson oversaw the cleanup process, which included determining which of the approximately 50,000 bikes had been

damaged, and which of those bikes could be repaired or salvaged, or simply discarded.

Johnson was provided weekly reports by Tom Wright (Wright), a quality associate [1] for Huffy, identifying the bikes that had been repaired, salvaged or discarded that week as well as the labor and other costs associated with the cleanup project. Johnson had personal knowledge of the information that was submitted to him on a weekly basis by Wright in that all documentation crossed his desk. Upon receiving the weekly reports, Johnson and other Huffy personnel inputted the data into Huffy's computer system.

Huffy utilized a software program to keep track of its bikes that contained the cost of production of each model. This same program was used to determine the money Huffy lost due to the August 27, 1998 incident. At the end of each week, numbers from the site were entered into the program so that the compilation of bikes affected by the loss and their model numbers could be recorded. At trial, Huffy offered Exhibit 1 into evidence. Huffy's Exhibit 1 is a spreadsheet that the computer program generated which reflects the number of bikes affected and established a monetary damage to Huffy in the amount of $143,916.21.

The data reflected on the spreadsheet the information inputted into Huffy's computer system from weekly reports submitted by Huffy personnel.[2] Huffy employees, including Johnson, inputted the data, which was reflected on the spreadsheet and the program included Huffy's cost in each particular inventory item.

In 2000, Huffy closed several plants throughout the United States, including the Farmington, Missouri facility. All records from the plants which were closed were sent to Huffy's home office in Ohio to a storage facility for holding. Subsequent to the filing of the first amended petition in March 2001, Huffy attempted to locate any records that were relevant to the August 27, 1998 water main break. Dave Duff (Duff), director of product safety for Huffy, testified that Huffy went through trailer loads of materials looking for any paperwork related to the incident. According to Johnson there were three files located at the Farmington facility which housed documents, including the weekly reports from Wright, which were entered into Huffy's computer program, which could not be found and provided to CWI.

At trial, CWI objected to Huffy's use of Exhibit 1 because it was a summary based on documentation Huffy was unable to produce for CWI's inspection. Johnson testified he had personal knowledge concerning the numbers contained in Exhibit 1. Johnson testified that based upon the CWI invoices for repacking, trash disposal, and hourly fees, one could determine the number of bikes discarded. Based upon a review of Huffy documentation and conversations with Huffy employees and counsel, Duff testified Huffy sustained property damages in the amount of $143,916.21 as a result of the water main breakage. Dan Beard (Beard), CWI's manager, admitted that CWI had no independent documentation which would contradict the number of bikes Huffy claimed to be salvaged or discarded.

---

1. Quality associates, members of Huffy's quality department, were responsible for routinely inspecting bicycles, assessing damage to bicycles, and determining which repairs were feasible.

2. The record reveals that from approximately September 1998 to February 1999, weekly reports were compiled concerning which bicycles were salvaged or thrown away.

After the close of all evidence, the trial court awarded judgment in favor of Huffy and against CWI in the amount of $254,677.62, which consisted of $143,916.21 for damages to 2,155 bicycles, $80,127.86 in expenses paid by Huffy to CWI for clean-up of a water main break, $16,500.00 in labor, travel, and material expenses incurred by Huffy for its initial damage assessment, and $45,143.93 in pre-judgment interest. This appeal follows.

In its sole point on appeal, CWI argues the trial court erred in awarding Huffy $143,916.21 in property damage to bicycles because the only evidence of such damage was Exhibit 1, an inadmissible summary based on documentation Huffy was unable to produce for CWI's inspection. We disagree.

Following a court-tried case, our review is governed by the principles articulated in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Unless the trial court's judgment is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies law, we must affirm the trial court's decision. *Id.* In reviewing the trial court's decision, we review the evidence, and all reasonable inferences, in a light most favorable to the judgment of the trial court, and disregard all contrary evidence and inferences. *Id.* The credibility of the witnesses and the weight to be given their respective testimony is left to the trial court, and the trial court is free to believe none, part or all of the testimony of any witnesses. *Id.*

The admission or exclusion of evidence lies within the sound discretion of the trial court, and the trial court's ruling will not be disturbed absent abuse of discretion. *Nelson v. Waxman*, 9 S.W.3d 601, 603 (Mo. banc 2000). "The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration." *Id.* at 604 (quoting *Oldaker v. Peters*, 817 S.W.2d 245, 250 (Mo. banc 1991)). A number of foundational requirements must be established prior to the admission of a document, including relevancy, authentication, the best evidence rule, and hearsay. *Estate of West v. Moffatt*, 32 S.W.3d 648, 653 (Mo.App. W.D. 2000). The determination of whether an adequate foundation was laid for the admission of a document is within the trial courts discretion. *Id.*

Here, the trial court admitted Exhibit 1, a computer generated spreadsheet, which set forth, among other things, the number of bikes damaged and the cost of production for each bike. CWI argues the spreadsheet was a "summary," which mandated the production of the underlying documentation on which the spreadsheet was based. The trial court admitted Exhibit 1 as a business record exception to the hearsay rule under Section 490.680, RSMo 2000,[3] which provides:

A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of the information, method and time of preparation were such as to justify its admission.

Missouri courts have recognized the use of computer printouts as business records. In *Ozark Appraisal v. Neale*, 67 S.W.3d

---

**3.** Unless otherwise indicated, all further statutory references are to RSMo 2000.

759, 766 (Mo.App.S.D.2002), the court specifically addressed the application of Section 490.680 to computer printouts:

> [U]nder this statute, where a business regularly uses computer equipment to enter and store its business records, print-outs of the records are admissible if the entries reflected are made in the regular course of business at or reasonably near the time of the occurrences of the events they record, and the trial court is satisfied that the source of the information and the mode and time of preparation indicate trustworthiness and hence justified admission.

(*citing Estate of West*, 32 S.W.3d at 653)

■ CWI suggests the spreadsheet was generated for the purpose of a "claim" and therefore should be treated as other summaries which are created for trial. We are not persuaded by this argument. Here, the trial court determined and the evidence revealed that Exhibit 1 was made in the ordinary course of business near the event of August 27, 1998, and was not a summary created for trial based upon other voluminous records.[4] Huffy was in the business of manufacturing, distributing and selling bicycles, and part of the ordinary course of that business was keeping track of the condition and location of those bikes. If inventory was damaged, lost, stolen, or shipped, the computer system used by Huffy was designed to track the inventory. The information reflected in Exhibit 1 was generated in the ordinary course of Huffy's business. The spreadsheet was generated near the time of the incident to manage inventory and five years prior to trial.

The record reveals that as a result of the August 27, 1998 water main break, Huffy discarded or salvaged 2,155 bikes at a cost of $143,916.21. Johnson testified he personally reviewed all information submitted by his employees on a weekly basis, and was at the CWI facility twice a week to oversee the response team. Johnson had personal knowledge, based upon his position as material manager, as to the damages sustained by Huffy and was qualified to testify concerning such damages.

■ Moreover, Johnson was qualified to testify as to the business of Huffy, specifically in reference to the incident of August 27, 1998. A witness is qualified to testify regarding a business record if he or she has sufficient knowledge of the business operation and methods of keeping records of the business to give the records probity. *Estate of West*, 32 S.W.3d at 653. The trial court is afforded broad discretion in determining whether a party has properly complied with Section 490.680. *Id.* In 1998, Johnson was the materials manager of the Farmington, Missouri facility. Johnson's duties included keeping track of the condition and location of all of the

---

4. CWI cites the federal rule that provides backup documents of summaries must be made available to the opposing party for purposes of trial. Rule 1006 of the Federal Rules of Evidence provides: "The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at [a] reasonable time and place. The court may order that they be produced in court." In reference to Rule 1006, the Advisory Committee's Note states: "The admission of summaries of voluminous books, records, or documents offers the only practicable means of making their contents available to judge and jury." 4 Wigmore Section 1230. Also *United States v. Scales*, 594 F.2d 558, 561–565 (1979) extensively discusses the use of summaries as an aid for trial purposes. Here, Exhibit 1 was not compiled in contemplation of trial, but was a document made in the regular course of Huffy's business near or at the time of the incident. Therefore, Rule 1006, even if it governed, would afford CWI no relief.

bicycles and parts Huffy had in production, storage or transit to distributors at any given time, including warehoused goods. On August 28, 1998 Johnson appeared at the Cape Girardeau CWI warehouse and personally inspected the damage. Johnson supervised the cleanup process, which included a damage assessment of approximately 50,000 bikes.

Johnson also possessed knowledge concerning the mode in which the spreadsheet was generated. Johnson was provided, and personally reviewed, weekly data which reflected the number of bikes repaired, salvaged or discarded, along with information regarding the cost of labor involved in separating and repackaging the bikes. Johnson had personal knowledge of the information that was submitted on a weekly basis by Wright, in that all documentation crossed his desk. Upon receiving the weekly data, Johnson, and other Huffy personnel, loaded the data into Huffy's computer system. According to Johnson, Huffy utilized a software program to keep track of its bikes, which included the cost of production of each model. The spreadsheet was generated near the time of the August 1998 loss, and reflected not only the number of bikes lost and salvaged, but included Huffy's cost in each particular inventory item. Sufficient evidence was adduced which satisfied the requirements of Section 490.680. Based upon the qualified testimony of Johnson, the trial court found Exhibit 1 was not compiled for trial purposes and summarized other business records, but that the spreadsheet, in and of itself, was an admissible business record.

Finally, CWI argues Exhibit 1 should have been excluded based upon the absence of the "Wright" documents. We

note the summaries discussed in CWI's cited authorities were not, as here, business records generated near or at the time of the event, but summaries generated for trial. *See Ahrens McCarron, Inc. v. Mullenix Corp.*, 793 S.W.2d 534, 539–540 (Mo. App. E.D.1990); *Refrigeration Industries, Inc. v. Nemmers*, 880 S.W.2d 912, 919 (Mo.App. W.D.1994); *Gasser v. John Knox Village*, 761 S.W.2d 728, 734 (Mo.App. W.D.1988).[5]

The trial court did not err in admitting Exhibit 1. There was no abuse of discretion in the admission of the computer spreadsheet. The trial court's judgment awarding Huffy $143,916.21 for property damage to bicycles is supported by substantial competent evidence.

Judgment affirmed.

PATRICIA L. COHEN, P.J. and KATHIANNE KNAUP CRANE, J., concur.

---

**5.** We also note that in *Ozark Appraisal,* the court found a summary of business records was not made in the regular course of business but compiled for trial and was therefore improperly admitted as a business record. 67 S.W.3d at 766.